UNITED STATES of America, Appellee,

v.

Con ERRICO, Appellant.

No. 229, Docket 80–1255.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1980.

Decided Dec. 1, 1980.

Gerald L. Shargel, New York City (Richard Ben·Veniste, Melrod, Redman & Gart-

lan, Washington, D. C., Albert J. Brackley, Brooklyn, N. Y., of counsel), for appellant.

Edward Agnew McDonald, Asst. Attorney–in–Charge, E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Thomas P. Puccio, Attorney in–Charge, U. S. Dept. of Justice, Organized Crime Strike Force, E. D. N. Y., Neil Jon Firetog, Sp. Counsel, Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, OAKES and NEW-MAN, Circuit Judges.

LUMBARD, Circuit Judge:

Con Errico appeals from his conviction after a jury trial in the Eastern District of New York, Chief Judge Weinstein presiding, on one count of violating the Racketeer Influenced and Corrupt Organization (RICO) statute, 18 U.S.C. § 1962(c) (1976).[1] Errico argues that the government introduced insufficient evidence to establish a RICO enterprise and that we should overturn *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976) (per curiam), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977), which interprets RICO to include the activities of both legitimate and illegitimate enterprise. We reject these arguments and affirm Errico's conviction.

I.

The New York Racing Association, a private company operating three thoroughbred racetracks in New York, began during the 1970's to offer multiple horse wagers on certain races. In an exacta race, a winning bettor must pick both the winner and the second–place horse. In a trifecta, the winning bettor must pick the first three horses in exact order. Although a bettor's chances of winning in any race are increased if the bettor knows that certain horses will not place, the higher stakes in these combination wagers make race fixing particularly profitable, since bets on all combinations of other horses will cost far less than the payoff on the winning combination.

In 1973, track officials became aware of unusual betting patterns through examinations of their computer records, alerting them that a bribing and betting scheme may have been at work. Those computer records displayed a series of large bets on exacta and trifecta races that consistently excluded some horses but covered every possible combination of the others. The ensuing investigation by racetrack officials and the FBI revealed that Errico, a 58–year old former jockey, was the linchpin of an organization of bribed jockeys and informed bettors who profited by placing high stakes, combination wagers on fixed races. The government's evidence against Errico came primarily from three sources: testimony of the jockeys to whom Errico offered bribes, surveillance of Errico's meetings with the bettors, and racetrack records revealing each day's big winners.

Errico first approached Jose Amy, a 26--year old jockey and the government's principal witness, in December of 1973 in the jockeys' locker room of the Aqueduct racetrack. Errico offered to pay Amy to keep his horse out of the money in the trifecta race that day. Amy refused. Errico attempted to bribe Amy again a few days later but met the same refusal. On March 5, 1974, Errico tried a third time more aggressively. He told Amy that the other jockeys had agreed to hold horses and then threatened "Mafia" retribution should Amy refuse him again. A frightened Amy agreed to hold his horse, and Errico gave him $1,500 in cash. Two or three weeks later, Amy held his horse again for another $1,500.

The month of August, 1974, when the Racing Association held its races at its Saratoga track, was a busy month for Errico's operation. He bribed Amy on two occasions, August 2 and 6. Eddie Belmonte, a jockey who operated on Errico's behalf, convinced jockey Ben Feliciano to hold horses for pay; Feliciano received $2,500 for an August 10 race and $5,000 for an August 24 race. Errico did find one jockey that month who could not be bought. Errico

---

1. Chief Judge Weinstein sentenced Errico to a ten--year prison term and fined him $25,000.

offered Michael Venezia $7,500 to hold a horse in a trifecta race, telling him that the "Latin American riders" were making "a good deal of money." Venezia nevertheless refused.

Those jockeys who joined Errico's circle of jockeys, however, made substantial profits possible for his circle of bettors. Internal Revenue Service Form 1099 must be filled in at the track by bettors who win more than $600 on a race, and thus the racetrack's copies of the forms reveal the identities of the big winners for each race. On August 2, 1974, Harry Kachougian won $91,560 and Salvatore Gannuseio won $45,780 on the trifecta that Errico paid Amy to fix. Track records for that day also reveal · consistent with Errico's technique of selective betting—that $35,000 had been bet on numerous combinations, all of which had excluded the horses ridden by Amy and other jockeys that Amy had identified as part of Errico's circle: Angel Cordero, Eddie Maple, and Jorge Velasquez. On the August 6 trifecta race, another race Errico paid Amy to fix, Kachougian won another $109,055 and Harold Hirsch won $13,155. The large bets that day excluded horses ridden by Amy and two other jockeys in league with Errico: Eddie Belmonte and Jamie Arellano. On August 20, 1974, the big bettors in the exacta race, which Errico had paid Feliciano to fix, excluded horses ridden by Feliciano, Cordero, and Marco Castenada, another Errico–corrupted jockey. Castenada, however, fouled Errico's system that day by finishing in the money; accordingly, there are no records of Errico's wagering colleagues winning big. However, an agent for the Thoroughbred Racing Protective Bureau, the track security force, observed Kachougian, Richard Perry, and Gaythorn Angell betting that day.

By November and December of 1974, the races had returned to the Aqueduct track and the FBI had begun a more extensive surveillance of bettors linked with Errico. Amy testified that he received $1,500 from Errico for each of three trifecta races in which he held his horse in those two months: November 22, December 6, and December 9, 1974. The track records reveal

that Harold Hirsch collected $77,570 from the December 6 trifecta, and Kachougian collected over $129,000 from the December 9 trifecta. On both days, the major combination bettors excluded horses ridden by Errico--corrupted jockeys.

The FBI, meanwhile, was observing the other end of Errico's operation: his relations with his bettors. In late November, 1974, Kachougian, Hirsch, Angell, Charles Garabedian, and David Berger rented rooms 402, 404, 406 and 410 of a Howard Johnson's Motor Lodge quite close to Aqueduct. On November 22, Errico spent fifteen minutes in that hotel immediately before directing Amy to hold his horse in the ninth race. At the end of that day, Errico met with Angell there for thirty minutes.

During the next few days, the bettors moved across the street to the Hilton Inn. On November 25, Errico met with Garabedian and Berger in their car in the Hilton parking lot. On December 6, the FBI watched Kachougian spend thirty minutes placing combination bets at Aqueduct and then saw Garabedian, Hirsch, and Berger join him. On December 7, the FBI agents rented rooms at the Hilton across the hall from the bettors; from that close range, they observed Errico entering one of the rooms registered to Kachougian, Garabedian, and Hirsch and then leaving eighteen minutes later. On December 9, Errico met with Angell and another man for several hours in the bar at Howard Johnson's. Angell and the other man had initially arrived in the company of Berger and Hirsch.

March 24, 1975 is the final date for which the government offered evidence of Errico's operations and is a crucial date for purposes of the five ·year statute of limitations, 18 U.S.C. § 3282 (1976). Amy testified that, on that day, Errico approached him in the Aqueduct jockeys' room and then paid him $1,500 for holding his horse in the final race. Most of the track records for that day had been destroyed, but the IRS records reveal a $19,000 winner who collected those winnings under a fictitious name.

Errico was indicted for a one -count RICO violation, on March 21, 1980. He moved to dismiss the indictment before trial on the ground that it failed to allege facts sufficient for an enterprise under RICO. Judge Weinstein denied the motion and directed the jury that "enterprise" means "any group of individuals associated in fact, although not a legal entity, a corporation, or partnership ... You may find that a group of individuals joined together to fix horse races is an enterprise as defined by this section. That enterprise must continue in an essentially unchanged form during substantially the entire period charged in the indictment.... Essentially unchanged. It doesn't mean that everybody has to be the same. Essentially, the core of it has to be the same throughout the period."

Because of the statute of limitations, the government had to prove that Errico bribed Amy on March 24, 1975, since this was the only overt act alleged within the limitations period. In his defense, Errico presented alibi testimony that he had been in California recuperating from facial cosmetic surgery on March 24; but he did not take the stand himself.

We hold that the charge accurately states the RICO standard and that the government's case amply satisfies that standard.

## II.

The RICO statute, 18 U.S.C. 1962(c) (1976), makes it unlawful for "any person employed by or associated with any enterprise engaged in ... interstate of foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of rack-

eteering activity." The term "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1976). The defendant does not dispute the jury's finding that he was engaged in a "pattern of racketeering activity" under the standards of 18 U.S.C. § 1961(5) (1976) and N.Y. Penal Law § 180.40 (McKinney's 1975). He does, however, challenge the adequacy of the government's evidence of a RICO enterprise. That challenge takes two forms. First, Errico proposes that this court overturn its holding in *United States v. Altese, supra,* which interprets RICO to include thoroughly illegitimate, as well as partially legitimate, enterprises. Second, he argues that there was insufficient evidence of a unified enterprise to support a RICO conviction. We reject both of Errico's arguments.

First, we see no need in the present context to reevaluate our holding in *United States v. Altese, supra.*[2] The district court in *Altese* interpreted RICO as a restriction only upon illegal activities of legitimate businesses and thus dismissed a RICO indictment based on the racketeering activity of a large scale gambling enterprise. This court reversed, holding that "all enterprises that are conducted through a pattern of racketeering activity ... fall within the interdiction of the Act." *Id.* at 106. At that time, we saw no Congressional intent to restrict RICO to legitimate enterprises. The issue is one for the Supreme Court, since the other circuits[3] are divided on the point. As a panel, we are bound by *Altese.*

**2.** Errico's motion to dismiss gives only the vaguest hint that he sought reversal of *Altese.* However, because this argument affects the applicability of the statute under which he was convicted, we reach the merits of the argument under the doctrine of *United States v. D'Amato,* 507 F.2d 26 (2d Cir. 1974).

**3.** *See United States v. Rone,* 598 F.2d 564 (9th Cir. 1979); *United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Cappetto,* 502 F.2d 1351 (7th Cir. 1974), *cert.*

denied, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). *Contra, United States v. Turkette,* 632 F.2d 896 (1st Cir. 1980); *United States v. Sutton,* 605 F.2d 260 (6th Cir. 1979), *vacated and rehearing en banc granted,* Nos. 78 5134 to 5139, 5141 to 5143, (6th Cir. Nov. 7, 1979) (rehearing held Apr. 2, 1980); *United States v. Anderson,* 626 F.2d 1358 (8th Cir. 1980). *See also United States v. Swiderski,* 593 F.2d 1246 (D.C.Cir. 1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979); *United States v. Moeller,* 402 F.Supp. 49, 58 -60 (D.Conn.1975).

Second, we reject Errico's claim that his network of jockeys and bettors failed to constitute an enterprise for RICO purposes. The definition of "enterprise" in 18 U.S.C. § 1961(4), *supra*, includes any "group of individuals associated in fact." Although we are aware that RICO should not be extended so as to sweep into the federal net all racketeering activities outlawed by state law, *see United States v. Huber*, 603 F.2d 387, 395–96 (2d Cir. 1979), Errico's organization here satisfies RICO's enterprise requirement. A circle of jockeys including Amy and others -who were joined through Errico with a circle of bettors including Kachougian, Hirsch, Angell and Berger regularly attempted to profit and did profit from the illegal fixing of races. The two circles came together and continued to operate with that single, illegal purpose from at least August, 1974 through March 24, 1975. That community of interest and continuing core of personnel provides the "group of individuals associated in fact" that is required for a RICO conviction. *See United States v. Wesman*, 624 F.2d 1118 (2d Cir. 1980).

Thus, Errico's organization was an enterprise that was unlawful under RICO and we affirm his conviction.