UNITED STATES of America, Appellee,

v.

Paul MAZZEI, Defendant-Appellant.

No. 285, Docket 82–1146.

United States Court of Appeals, Second Circuit.

Argued Sept. 20, 1982.

Decided Jan. 28, 1983.

Certiorari Denied May 23, 1983. See 103 S.Ct. 2124.

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

Edward A. McDonald, Attorney-in-Charge, U.S. Dept. of Justice, Organized Crime Strike Force, E.D.N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D. N.Y., Lawrence H. Sharf, Sp. Atty., E.D. N.Y., Brooklyn, N.Y. of counsel), for appellee.

Before LUMBARD, MESKILL and CARDAMONE, Circuit Judges.

MESKILL, Circuit Judge:

The defendant Paul Mazzei (Mazzei) appeals from the judgment of the United States District Court for the Eastern District of New York, Bramwell, *J.*, convicting him, after a four week jury trial, of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (1976 & Supp. V 1981) (RICO), conspiracy to commit sports bribery, 18 U.S.C. § 224 (1976), and interstate travel with the intent to commit bribery, 18 U.S.C. § 1952 (1976). Mazzei was sentenced to ten years imprisonment on the RICO count, and concurrent five year prison terms on the remaining two counts.

*Facts*

Mazzei's conviction arises from his involvement in the Boston College (B.C.) "point shaving" scheme. The facts pertinent to this criminal enterprise, which gained national prominence in February of 1981 when Sports Illustrated (SI) published

an article exposing the scheme,[1] are discussed extensively in the opinion that has been filed simultaneously with this decision. *See United States v. Burke,* 700 F.2d 70, (2d Cir. 1983). We refer the reader to that opinion for a more complete discussion of this scandal and therefore limit our discussion of the facts to those implicating Mazzei in the B.C. conspiracy.

The evidence presented at trial revealed that three general groups of individuals were responsible for devising and implementing the point shaving scheme. The "Pittsburgh Connection" consisted of Rocco Perla, his brother Anthony Perla, and appellant Mazzei. They appear to have initially conceived of the point shaving concept and were able to enlist the cooperation of Richard Kuhn, a B.C. basketball player who was a high school friend of Rocco Perla. The "New York Connection" consisted of Henry Hill and James Burke, who were responsible for creating a bookmaking syndicate to bet on B.C. games and arranging "protection" for the conspirators. The third group of individuals implicated in the scheme were the "insiders," those members of the B.C. basketball team who agreed to "shave points" in certain preselected games. The players received payments, usually $2,500 per game, in exchange for ensuring that B.C. did not beat the "point spread" in those games where the betting syndicate wagered against B.C.

Mazzei acted largely as a "middleman" in this conspiracy. He was linked to the Perla brothers in Pittsburgh and interceded on their behalf to enlist his "friends" in New York, including Henry Hill, to provide support and protection for the criminal enterprise. Mazzei had befriended Hill while both individuals were serving time in prison and he apparently used this connection to gain access to major New York gambling circles.

Henry Hill ultimately proved to be an unreliable friend. In exchange for full immunity, Hill exposed the point shaving scheme and implicated Mazzei in this criminal enterprise. Mazzei was jointly indicted and tried with James Burke, Anthony Perla, Rocco Perla, and Richard Kuhn, each of whom were found guilty under RICO and the bribery statutes. Mazzei has decided to appeal his conviction separate from his co-defendants, who pursued a joint appeal. Mazzei raises a variety of claims, some of which are identical to those argued by his co-defendants, others of which are distinct. To the extent that the claims are identical, they have been considered and rejected in the *Burke* opinion.[2] This decision addresses only those claims that are unique to Mazzei.

*Discussion*

### A. *Enterprise Element—RICO*

■ Mazzei's principal contention on appeal is that the district court improperly instructed the jury on the elements of the RICO offense. Specifically, Mazzei argues that the district court failed to explain to the jury that an "enterprise," as defined in 18 U.S.C. § 1961(4) (1976),[3] must be separate and distinct from its "pattern of racketeering activity," as defined in 18 U.S.C. § 1962(c) (1976).

■ None of the defendants below, including Mazzei, submitted requests to charge with regard to the definition of enterprise, nor was any exception taken to that portion of the charge. Accordingly, Mazzei's claim must fail unless there was

---

**1.** Hill & Looney, *How I Put The Fix In,* Sports Illustrated (Feb. 16, 1981).

**2.** Mazzei claimed that Kuhn's redacted confession should not have been submitted to the jury because it implicitly implicated him in the point shaving scheme in violation of his Sixth Amendment right of confrontation. We rejected this claim. *United States v. Burke,* 700 F.2d 70, (2d Cir. 1983). Mazzei also argued that the district judge improperly instructed the jury

regarding its right to return a partial verdict under Rule 31(b). We similarly rejected this claim. *Id.* at 78–81.

**3.** 18 U.S.C. § 1961(4) defines "enterprise" as: (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

plain error in the charge given. Mazzei's contention that the district court failed to charge an essential element of the RICO offense, if established, would amount to plain error. *See United States v. DeMarco,* 488 F.2d 828, 832 (2d Cir.1973); *United States v. Fields,* 466 F.2d 119, 121 (2d Cir. 1972).

The indictment charged the defendants with a violation of RICO, 18 U.S.C. § 1962(c) (1976), which makes unlawful "the conduct of [an] enterprise's affairs through a pattern of racketeering activity." Included within the statutory definition of enterprise is a "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1976). The indictment alleged an enterprise consisting of "a group of individuals associated in fact and utilizing, among other things, interstate travel and facilities in interstate commerce to influence by means of bribery the outcome of basketball games involving the Boston College varsity basketball team and to profit therefrom by wagering on those games." App. of Appellant at B1. The alleged pattern of racketeering activity was the defendants' efforts during 1978 and 1979 to influence the outcome of B.C. basketball games in violation of 18 U.S.C. § 224 (1976), and the defendants' travel in interstate commerce with the intent to commit bribery in order to influence the outcome of B.C. basketball games in violation of 18 U.S.C. § 1952 (1976).

Mazzei claims that to establish a violation of RICO, there must be proof that the alleged enterprise was distinct from the alleged pattern of racketeering activity. According to Mazzei, the government's indictment alleged an enterprise identical to the alleged pattern of racketeering activity, *to wit,* a conspiracy formed for the sole purpose of shaving points in B.C. basketball games. To support this contention, he relies principally on *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) and *United States v. Bledsoe,* 674 F.2d 647 (8th Cir.1982).

In *Turkette,* the Supreme Court was asked to decide "whether the term 'enter-prise' as used in RICO encompasses both legitimate and illegitimate enterprises or is limited in application to the former." 452 U.S. at 578, 101 S.Ct. at 2526. The *Turkette* Court reviewed the definition of enterprise found in 18 U.S.C. § 1961(4) (1976) and concluded that the statute did not exclude illegitimate organizations. The Court found that the legislative history of RICO compelled the same conclusion. In response to .criticism that including illegitimate organizations in the definition of enterprise would render redundant the element of a pattern of racketeering activity, the Court reasoned:

> That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Id.* at 583, 101 S.Ct. at 2528 (footnote omitted).

■ We agree that *Turkette* requires the government to prove both the existence of an "enterprise" and a "pattern of racketeering activity." We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements. There is nothing in the language or legislative history of the Act to support the appellant's view. Moreover, it does not make sense to impose a "distinctness" requirement in RICO cases. The appellant would have us rule that his actions are beyond the purview of RICO because he engaged only in point shaving and did not commit criminal acts other than those specifically contemplated in the conspiracy. Mazzei's interpretation would lead to the anomalous result that a large scale underworld operation which engaged solely in trafficking of heroin would not be subject to RICO's enhanced sanctions, whereas small-time criminals jointly engaged in infrequent sales of contraband drugs and illegal handguns arguably could be prosecuted under RICO. The Court will not place its *imprimatur* on such a counter-productive interpretation.

*Turkette* expressly provides that the proof used to establish the "pattern of racketeering activity" element "may in particular cases coalesce" with the proof offered to establish the "enterprise" element of RICO. 452 U.S. at 583, 101 S.Ct. at 2528. In our judgment, the proof of these elements coalesce comfortably in the present action. The government here proved an enterprise that was a "group of individuals associated in fact" with evidence establishing a common or shared purpose among the individuals and evidence that they functioned as a

continuing unit. *See United States v. Errico,* 635 F.2d 152, 156 (2d Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). The prosecution showed that the B.C. conspirators shared a common purpose—illegally shaving points on B.C. games to maximize their chances of betting successfully on those games—and that they functioned as a continuing unit, *i.e.,* during the 1978–79 B.C. basketball season. The government also proved that the enterprise derived profit through a "pattern of racketeering activity," *to wit,* "fixing" nine B.C. basketball games.

RICO's legislative history fully supports our analysis. Indeed, illegal gambling appears to have been a primary concern of Congress when enacting RICO,[4] and there is no language in the legislative history to indicate that the alleged enterprise must engage in activities separate and distinct from illicit gambling to come within the purview of RICO. In fact, the legislative history consistently speaks of the broad scope and important remedial purposes to be served by the Act.[5] The Supreme Court has honored this legislative intent by giving the term "enterprise" a broad scope. *Turkette,* 452 U.S. at 589–90, 101 S.Ct. at 2531–32; *see United States v. Hartley,* 678 F.2d 961, 987–88 (11th Cir.1982).

The appellant correctly notes that the Eighth Circuit's position on the "distinctness" issue is at odds with our analysis. *See United States v. Lemm,* 680 F.2d 1193, 1198–1201 (8th Cir.1982); *United States v. Bledsoe,* 674 F.2d 647 (8th Cir.1982); *United States v. Anderson,* 626 F.2d 1358 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). We are not persuaded by that precedent, substantially

**4.** *See* Remarks of Rep.St. Germain, 116 Cong. Rec. 35199 (Oct. 6, 1970) ("Gambling is generally thought to be the most profitable of the illegal goods and services provided by the rackets and the syndicates. The President's Crime Commission reported in 1967 that enforcement officials believe that illegal betting on horse races, lotteries, and sporting events totals about $20 billion, with a net profit of $6 to $7 billion a year.").

**5.** *See, e.g.,* Remarks of Rep.Kyl, 116 Cong.Rec. 35211 (Oct. 6, 1970) ("I agree with the gentleman from Michigan who just spoke [Rep. Conyers] that there are some provisions in this bill which could not have passed this body a few years ago. They are extraordinary measures. But it will take extraordinary measures to achieve the purposes which we must achieve today."); Remarks of Rep. Mayne, 116 Cong. Rec. 35300 (Oct. 7, 1970) ("The threat of organized crime must not be ignored or tolerated. Its insidious effects upon young people, upon legitimate business, upon our governments at all levels and upon our other institutions must be sternly and irrevocably eradicated.").

for the reasons detailed in this opinion. Moreover, this Circuit has implicitly rejected the interpretation of RICO advanced by Mazzei. *See United States v. Errico,* 635 F.2d 152, 156 (2d Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981); *United States v. Altese,* 542 F.2d 104, 106 (2d Cir.1976) (per curiam), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *see also United States v. Winter,* 663 F.2d 1120, 1136 n. 25 (1st Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983).

In *Errico,* we held that a network of jockeys and bettors, joined together for the "single, illegal purpose" of betting on "fixed" horse races, constituted an "enterprise" for purposes of RICO. 635 F.2d at 156. In *Altese,* the gravamen of the indictment was that the "defendants had conducted a large scale gambling business through a pattern of racketeering activity and the collection of unlawful debts, as defined in 18 U.S.C. § 1961(1), (5) and (6)." 542 F.2d at 105. The *Altese* defendants claimed on appeal that RICO applied only to *legitimate* enterprises that were conducted through a pattern of racketeering activity and did not extend to businesses conducted for solely illegal purposes. They asserted that RICO was not intended to provide added criminal sanctions in situations where the alleged enterprise was formed for an exclusively illegal purpose, in their case, gambling.

The *Altese* Court focused on the broad language of the RICO statute, particularly the legislature's regular use of the term "any":

> We first note that each of the four paragraphs of Section 1962 begins with the all inclusive phrase: "It shall be unlawful for any person ..." who has received *any* income derived from *any* pattern of racketeering activity, etc., to use *any* part of such income in the acquisition of "*any* enterprise engaged in ... interstate or foreign commerce." (emphasis supplied). The word "any" is explicit.

In addition, we note that in Section 1961 the Congress in defining the words "person" and "enterprise" again uses the word "*any*". In the light of the continued repetition of the word "any" we cannot say that "a reading of the statute" evinces a Congressional intent to eliminate illegitimate businesses from the orbit of the Act. On the contrary we find ourselves obliged to say that Title IX in its entirety says in clear, precise and unambiguous language—the use of the word "any"—that all enterprises that are conducted through a pattern of racketeering activity or collection of unlawful debts fall within the interdiction of the Act.

542 F.2d at 106 (footnote omitted). The Court observed that Congress could have included limiting language in the RICO statute if it had intended to restrict the application of RICO to certain types of enterprises. Rather, the Congress declared that the Act should "be liberally construed to effectuate its remedial purposes." Pub.L. No. 91–452, § 904(a), 84 Stat. 941, 947 (1970). Citing this legislative mandate, the *Altese* Court concluded that RICO was intended to provide enhanced sanctions against both legitimate and illegitimate businesses when they are conducted through a pattern of racketeering activity. 542 F.2d at 106. The Court also ruled, albeit implicitly, that a group formed for the sole purpose of illegal gambling and the collection of debts constituted an "enterprise" under RICO. *See id.* at 107 (Van Graafeiland, *J.,* dissenting).

RICO is primarily focused on the threat to society posed by organized crime.[6] Crime is no less organized where its purposes are singular. The district court properly charged each element of the RICO offense, and Mazzei has pointed to no omission in the charge that affected his substantive rights. We reject this claim.

### B. *Factual Determination of Enterprise*

■ Mazzei also asserts that the district court removed from the jury the factual

---

**6.** *See, e.g.,* Remarks of Rep. Rodino, 116 Cong. Rec. 35199 (Oct. 6, 1970); Remarks of Rep. Clancy, 116 Cong.Rec. 35206 (Oct. 6, 1970).

determination of enterprise. *See United States v. Huber,* 603 F.2d 387, 394–95 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 758 (1980). The portion of the charge that Mazzei objects to provided:

> The first element which I told you must find in order to convict a defendant on Count One is the existence of an enterprise consisting of an association or group of persons which was associated to influence by bribery the outcome of Boston College basketball games. Under the relevant legal definition contained in Section 1961(4) Title 18 of the United States Code, an enterprise includes and I quote: "any ... group of individuals associated in fact although not a legal entity."
>
> It is of course your responsibility as jurors to determine whether the Government has proved the existence of the enterprise *as alleged,* and my instructions to you are in no way intended to indicate how you should find on this question of fact. However, I instruct you that as a matter of law the type of association alleged by the Government, if proven, would constitute an enterprise within the meaning of the statute.

App. of Appellant at C2669–70 (emphasis added). The government's indictment alleged an enterprise, namely, a group of individuals sharing a common purpose—influencing the outcome of B.C. basketball games to secure a profit. The indictment also alleged a continuing unit—throughout the 1978–79 team season. The district court did not remove the factual determination of enterprise from the jury, rather it only defined the appropriate legal standard. The jury was left to evaluate the government's proof to determine whether its allegations were sustained.

The judgment of the district court is affirmed.