UNITED STATES of America,

v.

Mona KIM.

No. 3:99CR235(EBB).

United States District Court,
D. Connecticut.

Feb. 12, 2004.

Peter A. Kelly, Palominas, AZ, for Defendant.

James I. Glasser, Jeffrey A. Meyer, John H. Durham, U.S. Attorney's Office, New Haven, CT, Kari Anne Dooley, Mark G. Califano, U.S. Attorney's Office, Bridgeport, CT, for Plaintiff.

*RULING ON DEFENDANT'S MOTION FOR NEW TRIAL INTRODUCTION*

ELLEN BREE BURNS, Senior District Judge.

On January 30, 2003, following a two-week trial, defendant Mona Kim ("Kim" or

"defendant") was convicted of seven counts of the Superseding Indictment ("Indictment"), crimes which arose from her participation in a scheme to defraud insurance companies and investors. The jury unanimously found Kim guilty on Counts 15 and 16, charging interstate wire fraud transactions in violation of 18 U.S.C. § 1343; Counts 32, 42 and 43, charging Kim with international money laundering transactions involving the unlawful transfer of funds into the United States in violation of 18 U.S.C. § 1956(a)(2); Count 46, charging Kim with violating the RICO statute, pursuant to 18 U.S.C. § 1962(c); and Count 47, charging Kim with conspiracy to violate the RICO statute, pursuant to 18 U.S.C. § 1962(d). As to Count 46, the substantive RICO violation, the jury unanimously found that Kim committed all five alleged racketeering acts. Pursuant to FED. R. CRIM. P. 33, defendant now moves for a new trial. For the reasons discussed below, the Defendants' Motion For New Trial [Doc. No. 296] is DENIED.

## BACKGROUND

The Government's indictment and prosecution of Kim was based on her participation in Martin Frankel's scheme to defraud various investors, financial institutions, insurance companies, and the shareholders and policy holders of those insurance companies. At defendant's trial, the Government presented the live testimony of twenty-one witnesses, with one of those witnesses, FBI Special Agent Erin McNamara, testifying on two separate occasions. The Government's case-in-chief also consisted of voluminous documentary evidence, as well as reading into evidence the stipulated offense conduct of Gary Atnip, an indicted co-conspirator.

The witnesses and documentary evidence established Kim's involvement in Frankel's scheme to purchase life insurance companies in various states and to do so without disclosing to regulators or the public that Frankel would own the companies and manage their financial assets. The evidence produced showed that defendant participated in Frankel's scheme by assisting in the conversion, theft and embezzlement of insurance company assets, by using an alias of "Monica Kim" to assist Frankel in falsely representing that the assets were on account with Liberty National Securities ("LNS"), one of the entities involved in Frankel's scheme, and by establishing, maintaining and employing bank accounts under Frankel's control. The facts deemed necessary to an understanding of the issues raised in this motion are set forth in greater detail in the discussion below.

After defendant's conviction, she moved for a judgment of acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. This court entertained pleadings and heard oral arguments on defendant's Motion for Judgment of Acquittal, and on June 9, 2003, issued a written ruling denying defendant's motion. Defendant now raises many of the same claims set out in her Rule 29 motion, challenging the sufficiency of the evidence to establish defendant's guilt on the wire fraud, money laundering and substantive RICO counts, and arguing the jury instructions were insufficient to ensure a fair jury verdict. In addition, defendant also asserts that this court's exclusion of defendant's expert witness testimony resulted in manifest injustice, therefore requiring a new trial. In this ruling, the court addresses each of these arguments seriatim.

## LEGAL ANALYSIS

### I. STANDARD

 Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon

the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.Crim.P. 33. A district court has "broad discretion to decide Rule 33 motions based upon its evaluation of the proof produced." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir.1995). At the same time, "[t]he district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Produc.*, 861 F.2d 363, 370 (2d. Cir.1988) (citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983); *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978)).

## II. INSUFFICIENT EVIDENCE

### A. *Wire Fraud and Money Laundering*

In support of her Rule 33 Motion, defendant alleges that there was insufficient evidence to convict her of the two counts of wire fraud (Counts 15 and 16) and three counts of money laundering (Counts 32, 42 and 43). First, defendant argues that, because her conviction on these counts was based on an aiding and abetting theory of liability, the government was required to prove that the defendant knew of and intended to further the scheme to defraud the insurance companies prior to the charged wire fraud and money laundering transactions. Defendant charges that the government did not establish a "nexus" between the defendant's actions and the actual wire transfers to allow a reasonable jury to infer her culpable knowledge. Defendant raised this claim in her Rule 29 motion, and this court rejected the argument. While the standard to grant a motion for a new trial under Rule 33 is less stringent than in a Rule 29 motion, for the same reasons as outlined in this court's previous ruling, we once again conclude

that the government presented sufficient proof of Kim's knowledge and specific intent to sustain the jury's conclusions.

█ In *US v. Friedman*, a Second Circuit case cited by both defendant and the Government, the Court makes clear that "[c]harges of both conspiracy and 'aiding and abetting' require the Government to prove, beyond a reasonable doubt, that the defendant knew the specific nature of the conspiracy or underlying crime." *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir.2002) *citing United States v. Samaria*, 239 F.3d 228, 235 (2d Cir.2001) (conspiracy); *United States v. Labat*, 905 F.2d 18, 23 (2d Cir.1990) (aiding and abetting). The Court explained that proof of the defendant's knowledge that *some* crime would be committed is not enough, but that " 'circumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the *specific* elements of the underlying crime.' " 300 F.3d at 126 (emphasis added). Proof of a defendant's knowledge or intent includes " 'evidence that the defendant participated in conversations directly related to the substance of the conspiracy,' 'possess[ion of] or mention[ ] in documents important to the conspiracy,' 'proof that a defendant exercised authority within the conspiracy itself,' 'recei[pt of] a share of the profits from the conspiracy,' or a defendant's statements 'explicitly confirming the nature of the activity in which the co-conspirators were engaged.' " *Id.* (quoting 239 F.3d at 235–36).

█ Upon a review of the record, this court finds that the government introduced sufficient evidence to meet the standard set out in *Friedman*. The wire fraud transactions were executed on April 6, 1999, and April 9, 1999, involving transfers of over $50 million in insurance company funds. The money laundering convictions were based on stolen money wired on

March 18, April 6, and May 5, 1999. First, the government presented numerous acts by the defendant prior to the dates of the wire transactions, which established defendant's intent to promote the scheme to defraud. Karen Timmins ("Timmins"), a co-conspirator involved in Frankel's schemes, testified that Kim was aware of the scheme once she took on an increased role as office manager. According to Timmins, by the spring of 1999, she recalled discussing with defendant Frankel's insurance fraud and "the money hole" in the balance of insurance company accounts, which resulted from the assets of the insurance company being held in Frankel's personal account in Switzerland. *Tr. Vol. 6* at 27–28. An accountant also testified that he had conversations with defendant at the beginning of April 1999, in which, using an alias of "Monica Kim," defendant falsely confirmed a $600 million transfer of funds to an account with Liberty National Securities, one of the entities involved in the scheme. *Tr. Vol. 4* at 166. Defendant's promotion to office manager of the operation at 889 Lake Avenue in or around the end of 1998 or beginning of 1999 and her close working relationship with Frankel clearly exhibit defendant's awareness of the illegal nature of Frankel's scheme at the time of the wire fraud and money laundering transactions.

The Government also presented a plethora of circumstantial evidence, including Kim's use of her home address to register cars used in Frankel's endeavors and Kim's opening of numerous bank accounts in her name in February and March of 1999, which were later used to receive stolen money from Frankel's Swiss bank accounts, and also used to pay expenses related to Frankel's enterprise. *Tr. Vol. 11* at 100–1, 121–04; *Tr. Vol. 8* at 132–33. The government introduced evidence concerning Kim's discussions with a broker about the purchase of gold, including mem-

os Kim wrote to Frankel dated April 3 and 5, 1999, which advised him of the price Monex quoted for gold, in which she wrote "NO PAPER TRAIL" and "[b]ut we cannot sell it back to Monex without reporting it to the IRS." Govt. Exhibit G–6; *Tr. Vol. 2* at 50. In addition, the Government introduced evidence that Kim exercised authority within the conspiracy. Alicia Walters Pepe ("Walters"), whose work for Frankel overlapped with Kim's, testified that Kim was "overseeing the girls; telling them what to do..." *Tr. Vol. 2* at 195. Such testimony lends further support to the conclusion that she was aware of the illegality of her actions. *See Friedman,* 300 F.3d at 126.

Further, contrary to defendant's proposition, the jury could properly infer, based on evidence of defendant's conduct after the illegal transactions, that she was aware of the specific illegality of her actions and that she intended to assist Frankel in his scheme to defraud. *See, e.g. Lutwak v. United States,* 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593 (U.S.1953) ("The acts, being relevant to prove the conspiracy, were admissible, even though they might have occurred after the conspiracy ended."); *United States v. Germosen,* 139 F.3d 120, 127 (2d Cir.1998) (finding " 'Subsequent act' evidence may be admitted under Rule 404(b)" to show intent of conduct during charged conspiracy.).

The evidence produced regarding defendant's actions once Frankel informed her that "its all over" provides further support for a reasonable jury to conclude that she had specific knowledge of the scheme to defraud. *Tr. Vol. 6* at 96. For example, Walters testified that, when Frankel returned from a trip to Mississippi for a meeting with state insurance regulators, Walters was told to shred everything, and was told by Kim that the computers were all going to be "torn down." In so direct-

ing Walters, Kim also told her that "the shit's going to hit the fan. . . . Everything's falling apart now." *Tr. Vol. 3* at 29. Defendant eventually fled to Italy with Frankel, and admitted during her testimony at trial that she knew when they were in Italy that his money was stolen. *Tr. Vol. 11* at 136. Despite this knowledge, Kim opened a nominee bank account in her name, into which approximately $450,000 was wired by a diamond dealer from whom Frankel purchased diamonds with stolen money shortly before his flight. These subsequent acts provided the jury with further rationale to conclude that Kim knew that the money transferred by wire to her accounts was stolen from insurance company reserves. Without repeating the entire record in full, this court is confident that the government demonstrated that defendant had knowledge of the specific nature of the scheme to defraud insurance companies. Accordingly, defendant's claims fail.

### B. *Substantive RICO*

■ This court also rejects defendant's claim that the Government failed to show the defendant had sufficient discretion in directing the affairs of Frankel's enterprise to be convicted of the substantive RICO count. Defendant raised a similar claim in her Rule 29 motion, and this court previously ruled that the government presented evidence sufficient to meet the "operation and management" test to establish liability under 18 U.S.C. § 1962(c). *See Reves v. Ernst & Young*, 507 U.S. 170, 174, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (noting "an enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."). As stated in our previous ruling, the evidence established that Kim was the president of two companies used to pay employees at 889 Lake Avenue, as well as to pay other expenses. Kim herself opened a bank account to handle such expenses, as well as opening the Italian account in her name for Frankel. The evidence also showed Kim exercising some degree of discretion in her negotiations for the purchase of commodities. Kim also directed others in assembling documents for the fraudulent foundation created by Frankel, known as SFAF. Accordingly, this court once again finds Kim was more than a menial employee and actively participated in the operation and management of Frankel's enterprise.

■ This court is also unconvinced by defendant's argument that the Government failed to establish an enterprise separate from the defendant. *See Cedric Kushner Promotions Ltd. Vs. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) ("to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.") An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). *See also De Falco v. Bernas*, 244 F.3d 286, 307 (2d Cir.2001) ("evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise.") Under § 1962(c), while the person and the enterprise must be distinct, it is clear that a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise,'" *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir.1994) (quoting *Cullen v. Margiotta*, 811 F.2d 698, 730 (2d Cir.)), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

From the evidence adduced at trial, a reasonable jury could conclude that the defendant was a separate, culpable party from the Frankel enterprise. Frankel's enterprise was not limited to the commission of the wire fraud and money laundering transactions, but also included market research, running insurance companies, gathering data concerning financial markets, and conducting "special projects" activities, all of which provide ample links between the members of the enterprise which extend beyond the commission of the charged racketeering activities. Further, the fact that the defendant's actions were often under the direction of Frankel is not determinative of whether Frankel's scheme and defendant were separate and distinct entities. Indeed, the Second Circuit has expressly found that "the proof used to establish the 'pattern of racketeering activity' element 'may in particular cases coalesce' with the proof offered to establish the 'enterprise' element of RICO." *United States v. Mazzei,* 700 F.2d 85, 88 (2d Cir.1983) (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).

Finally, because this court found that there was sufficient evidence to convict defendant of the two wire fraud counts and three money laundering acts, defendant's argument that there was insufficient proof that she was guilty of the requisite predicate acts to impose RICO liability also fails.

## III. IMPROPER JURY INSTRUCTIONS

 Defendant makes numerous claims that she was not afforded a fair jury trial because the jury instructions were erroneous. "Because defendant did not object to the charge at trial, our review is for plain error." *United States v. Bala,* 236 F.3d 87, 94 (2d Cir.2000); *See also*

Fed.R.Crim.P. 52(b). The parties do not dispute that this is the proper standard of review.

To establish plain error, a court must find 1) an error, 2) that is plain, 3) that affects substantial rights.... If an error meets these first three requirements, the Court engages in a fourth consideration: whether or not to exercise its discretion to correct the error. The plain error should be corrected only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Keigue,* 318 F.3d 437, 441–42 (2d Cir.2003) (internal citations and quotation marks omitted).

 As for the first inquiry, a jury instruction is erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Dinome,* 86 F.3d 277, 282 (2d Cir.1996) (internal quotations omitted). "A 'plain' error is 'an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object.'" *United States v. Gore,* 154 F.3d 34, 43 (2d Cir.1998) (quoting *United States v. Tillem,* 906 F.2d 814, 825 (2d Cir.1990)). The defendant bears a heavy burden of persuasion to show that a district court's jury charge amounted to plain error. *United States v. Vasquez,* 267 F.3d 79, 87 (2d Cir.2001).

 Because we are reviewing the jury instructions used in defendant's trial for plain error, it is not necessary to consider each jury instruction to which defendant objects in isolation, "but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United States v. Weintraub,* 273 F.3d 139, 151 (2d Cir.2001). In *Weintraub,* the Second Cir-

cuit made clear that a jury instruction will not be considered "plain error" where there is no binding precedent that supports the position advanced by the defendant in challenging the jury instruction. *Id.* at 152. ("Without a prior decision from this court or the Supreme Court mandating the jury instruction that [defendant], for the first time on appeal, says should have been given, we could not find any such error to be plain, if error it was.") *Id.* The jury instructions given in this case stated the law accurately, tracking the statutory language of the applicable crimes where appropriate. The charge included standard instructions on each element of the charges in the indictment, in accordance with Leonard B. Sand et al's *Modern Federal Jury Instructions,* a source commonly used within this district and approved by the Second Circuit. *See, e.g. United States v. Yousef,* 327 F.3d 56, 131 (2d Cir.2003). In addition, this court has repeatedly found that the government submitted an abundance of evidence from which the jury could have concluded the defendant was guilty of all seven counts in the indictment. Accordingly, it is impossible that any error in the jury instructions "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Thomas,* 274 F.3d 655, 667 (2d Cir.2001). Therefore, defendant's challenges to the jury instructions fail.

### A. *Exclusion of Defendant's Expert Witness Testimony*

The defendant's final argument for a new trial is that the court erred in excluding the testimony of the defendant's expert witness, Dr. Lothstein, a ruling this court made after the parties had fully briefed the issue and given oral argument. The court's conclusion to exclude Dr. Lothstein's testimony was based on the insufficient probative value of Dr. Lothstein's testimony and the late disclosure of the witness by defense counsel.

A trial court has discretion over whether or not an expert witness will be helpful to the jury. *United States v. DiDomenico,* 985 F.2d 1159, 1163 (2d Cir. 1993). Dr. Lothstein intended to offer testimony about defendant's history of family abuse and mental illness as an explanation for defendant's involvement within the Frankel enterprise. This court found that such information about defendant's sadomasochistic and depressive tendencies was not sufficiently probative as to whether defendant had the knowledge and intent to join Frankel's enterprise, and was therefore excludable under Fed.R.Evid. 702. ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert...may testify thereto...").

Moreover, defendant also sought to have Dr. Lothstein testify concerning the ultimate issue of the case. Fed.R.Evid. 704(b) provides that, "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or· of a defense thereto. Such ultimate issues are matters for the trier of fact alone." Defendant argues that this court could have merely precluded his testimony on the ultimate issue, rather than excluding his testimony in entirety. However, the Second Circuit has upheld a district court's total exclusion of an expert witness under Rule 704(b) where the court also found the testimony would not meet the helpfulness criterion of Rule 702. *See* 985 F.2d at 1163 (finding a potential expert's testimony of defendant's mental state as defense that

she was manipulated and lacked knowledge of her co-conspirator's criminal activity was "close enough to a violation of Rule 704(b) that, when combined with the trial judge's assessment of helpfulness under Rule 702, amply justified his exercise of discretion to exclude it.") *Id.* Thus, this court affirms its earlier decision to preclude the expert's testimony pursuant to Rules 702 and 704(b).

In addition, this court found further grounds for exclusion of defendant's expert due to his late disclosure, pursuant to Fed. R.Crim. Proc. 12.2(b).

> If a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on either (1) the issue of guilt or (2) the issue of punishment in a capital case, the defendant must—within the time provided for filing a pretrial motion or at any later time the court sets—notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk.

Fed. R.Crim. Proc. 12.2(b).

While it is true that defense counsel took on the case only six months before trial, the record shows that defendant first met with Dr. Lothstein in October, and they had subsequent meetings in December and January. Nonetheless, defense counsel did not notify the government until January 10, 2003 of his intention to offer Dr. Lothstein as an expert. There was no reason why defendant could not have provided the government with the information in a more timely manner, rather than waiting until three days after jury selection, on the eve of trial to disclose such a key witness. Because there was no good cause for the late notice, this court had grounds to preclude defendant's proffered expert testimony in accordance with Fed. R.Crim.P. 12.2(2). *See also United States*

*v. Cervone,* 907 F.2d 332, 345 (2d Cir.1990) (affirming exclusion of late-noticed expert testimony in the absence of a bad faith finding.)

For all these reasons, this court upholds its previous decision that the probative value of the expert witness' testimony was vastly outweighed by the prejudice of the late disclosure of the expert. *Tr. Vol. 10* at 32–36. Accordingly, this court finds the exclusion of defendant's expert witness did not jeopardize the fundamental fairness of her trial.

### B. *Rule 29 Motion*

For all the above reasons, and the reasons outlined in this court's previous Ruling on Defendant's Motion For Judgement of Acquittal [Doc. No. 293], this court declines to reconsider the merits of said motion.

### *Conclusion*

Because defendant has failed to show any miscarriage of justice in her trial, this court declines to exercise its discretion under Federal Rule of Criminal Procedure 33 to grant a new trial. Accordingly, Defendant's Motion For a New Trial [Doc. No. 296] is DENIED.

SO ORDERED