**NATIONAL GROUP FOR COMMU-
NICATIONS AND COMPUT-
ERS LTD., Plaintiff,**

v.

**LUCENT TECHNOLOGIES INC.,
et al., Defendants.**

**No. 03 Civ. 6001(NRB).**

United States District Court,
S.D. New York.

Feb. 28, 2006.

Alan Trachtman, LeRoy Lambert, Healy & Baillie, LLP, Donald Burke, New York City, for Plaintiff.

Richard E. Donovan, Michael C. Lynch, Kelley Drye & Warren, Theodore V. Wells, James Brochin, Paul, Weiss, Rifkind, Wharton and Garrison LLP, Boaz S. Morag, Howard Zelbo, Cleary Gottlieb Steen & Hamilton LLP, Turner P. Smith, Elizabeth H. Miller, Curtis Mallet–Prevost Colt & Mosle LLP, New York City, Laurence A. Urgenson, Edwin John U., Kirkland & Ellis LLP, Washington, DC, Roger M. Witten, Kimberly Parker, Wilmer, Cutler & Pickering, New York City, Michael J. Madigan, Suzanne Ashley, Akin Gump Strauss Hauer & Feld LLP, Michael S. Scheininger, Jason Silverman, McKenna Long & Aldridge LLP, Washington, DC, Andrew W. Goldwater, Laurence D. Borten, Friedman Kaplan Seiler & Adelman LLP, Bruce Yannett, Andrew J. Ceresney, Debevoise & Plimpton, New York City, for Defendants.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

On December 22, 2004, plaintiff National Group for Communications and Computers Ltd. ("NGC" or "plaintiff")[1] filed a second amended complaint ("SAC") against defendants Lucent Technologies Inc., Lucent Technologies International Inc., Richard A. McGinn, Donald K. Peterson, James K. Brewington, John G. Heindel, Robert A. McArdle, Robert W. Frye, Abdullah Said Bugshan & Brothers Ltd., ACEC SA, Arabian Consulting & Engineering Center, Abdullah Ahmed Bugshan, Mohsen Sheikh El–Ard, Jacques Amacker, Ali Al–Johani, IT Properties Inc. and Mazhar Raslan. Plaintiff asserts causes of action under 18 U.S.C. §§ 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The alleged predicate acts include violations of federal money laundering statutes, extortion violating the Hobbs Act, and bribery violating the Foreign Corrupt Practices Act, the Travel Act, as well as statutes of New York, Washington, and New Jersey. *See* SAC at ¶ 111 ("Summary of Claim"). Plaintiff essentially claims that the defendants participated in, and conspired to participate in, schemes

---

1. The second amended complaint indicates that NGC has changed its name to Silki–La–Silki National Telecom Ltd., but we will refer to the plaintiff as "NGC" as the parties do in their briefs. Neither party has requested that the Court amend the caption in this matter.

to extort funds from NGC and to bribe a Saudi government official, Ali Al–Johani ("Al–Johani") in order to persuade Al–Johani to make decisions favorable to Lucent and harmful to NGC.

Defendants in this case have moved jointly to dismiss the complaint on the grounds that: (1) this court lacks subject matter jurisdiction; (2) the claims are barred by the statute of limitations; and (3) the complaint fails to properly plead a RICO claim.[2] Certain defendants have also submitted supplemental memoranda presenting additional arguments to support the dismissal of claims against them individually.[3]

For the reasons set forth below, we grant the defendants' motion to dismiss. While there is subject matter jurisdiction in this case, we find that some of the claims are time-barred and that claims against remaining defendants must be dismissed because the complaint fails to adequately allege a RICO "enterprise."

## BACKGROUND[4]

### The Parties

Plaintiff NGC is a telecommunications company doing business in Saudi Arabia and incorporated under the laws of that country. SAC at ¶¶ 3–4.

Defendant Lucent Technologies Inc., a successor in interest to AT & T International, is a Delaware corporation that designs and builds communications networks. SAC at ¶¶ 7–9. AT & T International changed its name to Lucent Technologies Inc. in February 1996. SAC at ¶ 7. Defendant Lucent Technologies International Inc. is a subsidiary of Lucent Technologies Inc. and is also organized under Delaware law. SAC at ¶¶ 10–11. (Collectively, these defendants will be referred as "Lucent.")

Defendant Richard A. McGinn ("McGinn") served as a Chief Operating Officer for Lucent and as a member of its Board of Directors from 1995 to January 1998, when he became Chairman of the Board of Directors. His employment with Lucent was terminated on October 22, 2000. SAC at ¶ 12.

Defendant Donald K. Peterson ("Peterson") was Executive Vice–President and Chief Financial Officer of Lucent from 1996 to 2000. SAC at ¶ 13.

Defendant James K. Brewington ("Brewington") was employed by Lucent as President of Lucent Mobility Solutions and as a Group President of Lucent Wireless. SAC at ¶ 14.

Defendant Robert A. McArdle ("McArdle") was employed by Lucent as a Vice

---

2. *See* Defs.' Joint Mem. of Law in Support of Mot. to Dismiss at 2. ("Defs.' Omnibus Brief") *See also* Defs.' Joint Reply Mem. of Law in Support of Mot. to Dismiss ("Defs.' Joint Reply") Defendants' arguments fall into the following general categories: (1) failure to adequately allege causation and standing; (2) failure to adequately allege an "enterprise"; (3) failure to allege that each defendant committed two predicate acts constituting a "pattern"; (4) failure to allege that each defendant's participation satisfies the "operation and management" test; and (5) failure to plead the elements of a RICO conspiracy under 18 U.S.C. § 1962(d).

3. *See* Bugshan Defs.' Mem. of Law in Support of Defs.' Mot. for a Stay Pending Arbitration; Supplemental Mem. of Law in Support of Al–Johani's Mot. to Dismiss; Supplemental Mem. of Law of Defs. Mazhar Raslan and IT Properties in Support of Mot. to Dismiss; Individual Lucent Defs.' Joint Mem. of Law in Support of Motions to Dismiss.

4. The following facts are taken from plaintiff's second amended complaint. For purposes of resolving the motions to dismiss, we assume that plaintiff's factual allegations are true.

President and Director of U.S. Program Management. SAC at ¶ 28.

Defendant John G. Heindel ("Heindel") was employed by Lucent as President of Lucent Worldwide Services and served as a member of Lucent's Senior Management Board until April 1, 2003. Heindel was President of Lucent's Saudi Arabia branch between December 1996 and February 2001. SAC at ¶ 28.

Defendant Robert W. Frye ("Frye") was Chief of Protocol and Managing Director of International Customer Relations for Lucent. SAC at ¶ 29. Frye's job required him to work with foreign dignitaries. *Id.*

Defendant Ali Al–Johani is a citizen of Saudi Arabia and has residences in both Saudi Arabia and Washington, DC. SAC at ¶ 71. Al–Johani was a Saudi government official between 1995 and 2003. SAC at ¶¶ 72–73. Beginning in 1995, Al–Johani headed an agency responsible for maintaining Saudi Arabia's telephone system called the Ministry of Post Telephone and Telegraph ("MoPTT"). SAC at ¶¶ 68,72. In 1998, MoPTT's assets were reorganized and the Saudi Telecom Company ("STC") was formed. Al–Johani served as STC's Chairman. STC is a joint stock corporation organized under the laws of Saudi Arabia, and the government of Saudi Arabia appears to be the majority shareholder. SAC at ¶¶ 69–70.

Defendant Abdullah Said Bugshan & Brothers Ltd. ("ASB") is a partnership or corporation organized under the laws of Saudi Arabia with offices in that country. SAC at ¶ 45. ASB is a conglomerate of businesses that includes a communications business. According to the complaint, ASB was a "sponsor, joint venture partner, agent, subcontractor and/or landlord" for Lucent and its corporate predecessor in Saudi Arabia. SAC at ¶ 47.

Defendant Abdullah Ahmed Bugshan ("Bugshan") is a citizen of the Kingdom of Saudi Arabia and resides in Riyadh, Saudi Arabia. SAC at ¶ 48. Bugshan is a senior partner and general manager of ASB. SAC at ¶ 49.

Defendant Arabian Consulting & Engineering Center ("ACEC–Saudi") is a company organized under the laws of Saudi Arabia and does business in that country. SAC at ¶ 50. ACEC–Saudi is owned and/or controlled by either Bugshan or ASB. SAC at ¶ 51.

Defendant ACEC SA (also referred to as "ACEC–Suisse") is a company organized under the laws of Switzerland with a place of business in that country. SAC at ¶ 52. ACEC–Suisse is owned or controlled by Bugshan or ASB. SAC at ¶ 53.

Defendant Mohsen Sheikh El–Ard ("El–Ard") is a citizen of both Syria and Switzerland and resides in Switzerland. *Id.* El–Ard is alleged to be the business manager of ASB and a Director of ACEC–Suisse. SAC at ¶ 56.

Defendant Jacques Amacker ("Amacker") is a citizen and resident of Switzerland who is employed by ACEC–Suisse. SAC at ¶¶ 58–59.

Defendant IT Properties Inc. ("IT") is a corporation organized under the laws of Delaware with its principal place of business in New York City. SAC at ¶ 63.

Defendant Mazhar Raslan ("Raslan") is the President of IT and apparently owns 90% of its shares. SAC at ¶ 64. According to plaintiff, Raslan "is an agent for Bugshan in New York City and administers a bank account at Citibank–New York for and on behalf of Bugshan, ACEC–Saudi and/or other Bugshan controlled entities for the purpose for the purpose ... of paying money to and providing financial benefits to Al–Johani." SAC at ¶ 64.

### Telephone Expansion Projects and Related Contracts

#### A. TEP–6

In 1993, a Saudi government agency, MoPPT, initiated Saudi Arabia's Sixth Telecommunications Expansion Project ("TEP–6") to upgrade and expand the country's telephone system. SAC at ¶ 94. On August 13, 1994, AT & T International successfully bid for work on TEP–6 and entered into a $4.6 billion contract with MoPPT to install digital telephone lines. ("TEP–6 Prime Contract"). SAC at ¶¶ 95–98. On the same day, AT & T International and ASB jointly entered into a $103 million contract ("GSM Contract") with MoPTT to install GSM telephone lines.[5] *See* SAC at ¶¶ 99–100.

Thereafter, AT & T International, which later became Lucent, and ASB entered into various subcontracting arrangements, including certain contracts with plaintiff. Specifically, NGC signed two subcontracts with Lucent and five subcontracts with ASB. SAC at ¶¶ 102–106. Two of these subcontracts are at issue in this litigation. The first is SRS No. 1561/950625 ("ASB Subcontract No. 5") which was executed on February 22, 1995 and terminated by AT & T International in a letter dated January 23, 1996. SAC at ¶¶ 105, 180, Ex. 1. This subcontract was valued at $47 million. SAC at ¶ 181. The second subcontract at issue, referred to by the parties as the "RET/WSF subcontract" or "Lucent Subcontract No. 1," concerned the installation of roadside emergency telephone and way-

side facilities. AT & T International and NGC apparently executed this subcontract in April 5, 1995. *See* SAC at ¶ 410; Tr. of Dec. 2, 2005 Conf. at 3. The wayside facilities portion of the RET/WSF subcontract was cancelled on June 6, 1999.[6] The parties currently dispute when the roadside emergency telephone portion of the work under the subcontract was cancelled, but plaintiff claims that the subcontract was cancelled on January 29, 2000. *Compare* Defs.' Omnibus Brief at 10–11 *with* Pl.'s Opp. at 10–14. The RET/WSF subcontract was originally a 4–year contract with a total fixed price of $77.2 million. SAC at ¶ 411.[7]

According to NGC, the cancellation of both contracts was the result of a bribery scheme targeting Al–Johani and carried out by the officers and employees of Lucent, ASB and ACEC–Suisse and ACEC–Saudi. SAC at ¶ 125. In this action, NGC claims total damages in excess of $75 million related to the termination of the contracts. SAC at ¶ 126.

Plaintiff's breach of contract claims related to ASB Subcontract No. 5 and RET/WSF subcontract are currently pending before a federal district judge in New Jersey. *See Nat'l Group for Communications and Computers, Ltd. v. Lucent Technologies Int'l*, 331 F.Supp.2d 290 (D.N.J. 2004); Tr. of Dec. 2, 2005 Conf. at 30.

#### B. TEP–7

In 1998, STC initiated another Telecommunications Expansion Project ("TEP–7").

---

5. "GSM" is an abbreviation for Global System for Mobile Communications, one of several transmission technologies used in wireless telecommunications systems.

6. A copy of a letter from Lucent Technologies to NGC dated June 6, 1999 informing NGC that Saudi Telecom Company had cancelled the WSF project was submitted to this Court during the oral argument held on December

2, 2005. In their motion papers, the parties agreed that the WSF portion of the work governed by the RET/WSF subcontract was cancelled on June 6, 1999. *See* Pl.'s Opp. at 11; Defs.' Joint Reply at 4.

7. The amount of damages NGC intends to claim for the cancellation or modification of the RET/WSF subcontract is not clear from the complaint.

As with TEP–6, Lucent was awarded the majority of the work for the project. SAC at ¶ 108.

### Alleged Extortion

Plaintiff alleges that "the defendants, through the Enterprise" extorted millions of dollars from NGC and other subcontractors of Lucent and ASB during the course of the TEP–6 project in Saudi Arabia. SAC at ¶ 113. Specifically, plaintiff alleges that defendants Lucent, Heindel, ASB, Bugshan, ACEC–Saudi, ACEC–Suisse, El–Ard and Amacker together with various non-parties "directed" and "implemented" the extortion scheme. SAC at ¶ 116.

Bugshan made the first extortionate demands of NGC during a March 1995 meeting in Saudi Arabia attended by Bugshan, Abdul Aziz Al–Hagbani ("Al–Hagbani") (NGC's President), El–Ard (representing ASB) and an individual named Hemaily (representing AT & T International). *See* SAC at ¶¶ 153–156. During this meeting, Bugshan insisted that NGC pay a six percent kickback on all invoices submitted for TEP–6 work or risk losing existing and future contracts. SAC at ¶¶ 114–15, 137–161. Although Al–Hagbani initially protested, NGC ultimately agreed to make the kickback payments after the meeting. SAC at ¶¶ 160, 162–79.

Shortly thereafter, El–Ard visited NGC's Saudi office, bringing two drafted agreements to be signed by NGC and ACEC–Saudi, a company allegedly controlled by Bugshan. SAC at ¶¶ 164–68. Plaintiff now claims that these contracts were "phony agreements" intended to disguise the kickback payments. SAC at ¶ 176. The "Preliminary Agreement" specified that ACEC–Saudi would assist NGC in submitting TEP–6 offers to AT & T International and ASB by preparing proposals and technical studies. SAC at ¶ 169. The agreement further stated that ACEC–Saudi would be entitled to a percentage of NGC's subcontract payments as well as additional payments set forth in an attached schedule. *See* SAC at ¶¶ 169–172. ACEC–Saudi and NGC also signed a "Final Agreement" which stated that ACEC–Saudi had performed the services specified in the Preliminary Agreement and confirmed that NGC would make the associated payments to ACEC–Saudi. SAC at ¶¶ 166, 174–76. NGC made its first payment on August 5, 1995. SAC at ¶ 201.

During November 1995, Jabry (ASB's CFO and not a named defendant) allegedly visited NGC and made a new demand that NGC make kickback payments for one of the ASB subcontracts "up front" on the actual invoice date rather than thirty days after NGC received payment on the invoices. SAC at ¶ 182. NGC's President apparently refused to make the six percent kickback payments up front. SAC at ¶ 184. NGC claims that as a result of this refusal, AT & T International cancelled ASB Subcontract No. 5 on January 23, 1996. SAC at ¶ 185. Al–Johani refused to intervene in this matter sometime in February 1996. SAC at ¶¶ 185–92.

NGC claims to have made kickback payments totaling $3,652,065 to ACEC–Saudi between 1995 and 2000. SAC at ¶¶ 195–96. Plaintiff also alleges that some portion of the payments it made to ACEC were ultimately used by Lucent and ASB and "other members of the Enterprise" to bribe Al–Johani. SAC at ¶ 117.

### Bribery of Al–Johani

Plaintiff specifically alleges that the following acts constituted bribery of Al–Johani: [8]

---

8. *See* SAC at ¶¶ 127, 223 (summarizing acts of bribery).

(1) Lucent and ASB provided free use of a private jet to Al–Johani and his family for a number of trips from Saudi Arabia to the United States and Europe between 1995 and 2000. SAC at ¶¶ 224, 232–36.

(2) "Lucent, through Frye and other Lucent officers and employees and ACEC–Suisse through Amacker and other ACEC–Suisse officers and employees" allegedly paid for hotel accommodations for Al–Johani and his family in New York City and Seattle between 1997 and 2002. SAC at ¶¶ 263–69, 294–305.

(3) Lucent, through Frye, guaranteed the payment of Al–Johani's medical expenses at New York hospitals in 1997. SAC at ¶¶ 249–54, Exs. 2 and 3.

(4) Lucent, ASB, Amacker, ACEC–Suisse and "other members of the enterprise" paid for medical expenses of Al–Johani and his family during the period between 1997 and 2002. SAC at ¶¶ 248–60, 278–92.

(5) Lucent made three anonymous gifts, totaling $2,035,000, to a Seattle hospital at the insistence of Al–Johani in 1998 and 1999. SAC at ¶¶ 307–335.

(6) "Bugshan, ACEC–Saudi and/or other Bugshan-controlled entities" deposited money in a New York Citibank account that was used to make payments for rent and other expenses in the U.S. that benefited Al–Johani and his family. SAC at ¶¶ 238–245.

(7) Unspecified defendants made a payment of $250,000 to Al–Johani in June 2000 through the New York Citibank account maintained by defendants Raslan and/or IT Properties. SAC at ¶ 241.

These bribes totaled approximately $15 million and were allegedly paid for and facilitated by Lucent and its employees as well as ASB, ACEC–Saudi, ACEC–Suisse, IT Properties, Raslan and Amacker. SAC at ¶ 129. In exchange for the bribes, Al–Johani allegedly "directed STC to make numerous decisions which were favorable to Lucent and ASB and detrimental to NGC and others." SAC at ¶ 124. Specifically, plaintiff claims that Al–Johani consented to the cancellation of two of NGC's TEP–6 subcontracts with Lucent because of the bribes he received. SAC at ¶ 125.

### Money Laundering

Plaintiff also claims that various members of the alleged enterprise violated federal money laundering statutes by transferring payments for the benefit of Al–Johani from Saudi Arabia to New York. *See* SAC at ¶ 123. Some of the money allegedly used to bribe Al–Johani was transferred through bank accounts in Switzerland to accounts in the U.S. SAC at ¶¶ 442–55.

## DISCUSSION

### I. Does This Court Have Subject Matter Jurisdiction?

As a threshold issue, this Court must determine whether subject matter jurisdiction exists in this rather unusual case. Defendants argue that this Court lacks jurisdiction because the gravamen of the complaint involves foreign events. *See* Defs.' Omnibus Brief at 3–6. Indisputably, this RICO case involves a foreign plaintiff and a number of foreign defendants. Moreover, plaintiff's injuries include kickback payments made to Saudi companies in Saudi Arabia as well as damages sustained when two contracts governed by Saudi law were terminated. While much of the challenged conduct occurred in Saudi Arabia, some of the alleged predicate

acts occurred in the United States, and the named defendants include a number of American citizens as well as an American company, Lucent. Plaintiff's central theory is that Lucent's bribery of a Saudi official in the United States caused that official to support the termination of NGC's subcontracts in Saudi Arabia.

Because the RICO statute is silent as to its extraterritorial application, courts have looked to precedent provided by transnational securities and antitrust cases in determining what degree of domestic activity is required to trigger jurisdiction in international RICO cases. *See North South Finance Corp. v. Al–Turki*, 100 F.3d 1046, 1051 (2d Cir.1996). Two tests have been employed in RICO cases involving foreign parties and activities: an "effects test" and a "conduct test." *Id.*[9] While the Second Circuit has not yet decided which test should govern, it has suggested that the ultimate inquiry is whether "Congress would have wished the precious resources of United States courts ... to be devoted to [foreign transactions] rather than leave the problem to foreign countries.'" *Id.* at 1052 (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.1975)).

## A. Effects Test

■ Two variants of the effects test have been applied in RICO cases. One version, borrowed from securities law, confers jurisdiction "whenever a predominantly foreign transaction has substantial effects within the United States." *North South Finance*, 100 F.3d at 1051 (quoting *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir.1989)). Under the antitrust version of the effects test, jurisdiction exists when extraterritorial conduct is intended to and actually does have a detrimental effect on United States imports or exports. *See id.* Both versions of the effects test are designed "to protect domestic investors and markets from corrupt foreign influences." *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386(KMW), 2002 WL 319887, at *21 (S.D.N.Y. Feb. 28, 2002) (quoting *Madanes v. Madanes*, 981 F.Supp. 241, 250 n. 6 (S.D.N.Y.1997)).

■ In this case, plaintiff invokes the effects test derived from securities case law and claims that defendants' conduct had three domestic effects. *See* Pl.'s Opp. at 6–7. First, Lucent is an American corporation that secured significant financial benefits "from the cancellation of NGC's subcontracts that resulted from [the] bribery [of Al–Johani]." *See id.* at 7. Second, after NGC's contract with Lucent was cancelled, NGC cancelled a purchase order with a U.S. supplier, Telemobile, ultimately harming two businesses in the United States. *See id.;* SAC at ¶¶ 418–21 (explaining that NGC cancelled purchase order with Telemobile, an action that also harmed another supplier, Benner–Nawman). Third, plaintiff suggests that the bribery of foreign officials generally "diminishes the United States' stature and influence abroad, and conduct of this kind victimizes the citizens of the United States." Pl.'s Opp. at 7.

Although Lucent is an American company, and plaintiff suggests that Lucent benefited in an amount between $10 and $35 million[10] from the cancellation of the RET/WSF subcontract in Saudi Arabia, it is not

---

9. "Because it is not clear which test should be used in the context of RICO, jurisdiction will exist where either test is satisfied." *Roquette America, Inc. v. Alymum N.V.*, No. 03 Civ. 434(DC), 2004 WL 1488384, at *7 (S.D.N.Y. July 1, 2004) (quoting *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Corp.*, 98 F.Supp.2d 480, 486–87 (S.D.N.Y.2000)).

10. *See* SAC at ¶¶ 400, 412.

clear that the cancellation of the Saudi contracts had a "substantial" or intentional domestic effect. Any distorting impact on Lucent's profits or stock price is purely speculative. *See Nasser v. Andersen Worldwide Societe,* No. 02 Civ. 6832(DC), 2003 WL 22179008, at *6 (S.D.N.Y. Sept. 23, 2003) (holding that general allegations about profit gains by U.S. partners and negative impact on financial market insufficient to satisfy either variant of the effects test).

The second and third effects plaintiff alleges are also insufficient to confer jurisdiction. That NGC cancelled its subcontracts with a U.S. supplier, which in turn cancelled its subcontract with another U.S. supplier, after the cancellation of the RET/WSF subcontract in Saudi Arabia which was allegedly the result of bribery in the United States is exactly the kind of "remote and indirect effect" that the Second Circuit has suggested should not qualify as substantial. *North South Finance,* 100 F.3d at 1052. We also find no support in securities, antitrust or RICO decisions of this Circuit to support plaintiff's suggestion that the effects test is satisfied when conduct generally harms U.S. citizens by adversely affecting the "stature" of the United States. In sum, we are not convinced that plaintiff's allegations satisfy the effects test.

### B. Conduct Test

■ In order to establish jurisdiction under the alternative conduct test, plaintiff must show: (1) that "conduct material to the completion of the fraud occurred in the United States"; and that (2) the U.S. conduct was the "direct cause of the alleged injury." *North South Finance,* 100 F.3d at 1053 (citations omitted); *Madanes,* 981 F.Supp. at 250 (quoting *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1046 (2d Cir.1983)).

While the conduct test was developed in the context of transnational securities fraud cases, it seems appropriate to analyze this RICO case, which does not involve fraud claims, in a parallel fashion.[11] In a RICO case such as this one, it seems most reasonable to interpret the first prong of the conduct test to require a determination of whether conduct that was material to the completion of predicate acts occurred in the United States. *See Alfadda v. Fenn,* 935 F.2d 475, 480 (2d Cir.1991) (concluding that subject matter jurisdiction existed where "predicate acts ... occurred primarily in the United States").[12]

Many of the predicate acts of bribery alleged in this case took place in the United States. For example, Lucent, ACEC–Suisse and Amacker allegedly paid the hotel expenses of Al–Johani and his family in New York and Seattle. *See* SAC ¶¶ 263–67, 294, 296, 299, 304, 375, 567, 579. Some of the defendants also allegedly paid rent for Al–Johani and his family in Washington, D.C. and Boston. *See* SAC ¶¶ 240, 243, 447. Some of the defendants allegedly maintained and used U.S. bank accounts to pay bribes to Al–Johani. *See* SAC ¶¶ 130, 241, 242. Lucent allegedly bribed Al–Johani by making three donations to-

---

**11.** Although plaintiff has argued that the doctrine of fraudulent concealment tolls the statute of limitations in this case, NGC has not alleged that acts of fraud caused its injuries.

**12.** The district court in *North South Finance* initially ruled that the extraterritorial reach of RICO should be determined by focusing on whether the defendant's conduct in the United States "was material to the completion of a racketeering act." *See* 100 F.3d at 1048–49. While the Second Circuit affirmed the court's determination that dismissal was appropriate on subject matter jurisdiction grounds, the Circuit did not clearly endorse the test the district court applied. *See id.*

taling $2,035,000 to a Seattle hospital at his request. *See* SAC ¶¶ 131, 219, 336. We conclude that these predicate acts are sufficient to establish the first element of the conduct test.

However, plaintiff must also show that the acts of bribery in the United States were a "direct cause" of the injuries it suffered in Saudi Arabia. *See North South Finance*, 100 F.3d at 1053. This is a closer question. NGC has alleged that there is a significant causal link between the bribery of Al–Johani and the cancellation of the RET/WSF subcontract in Saudi Arabia. By virtue of Al–Johani's position at MoPTT and later STC, he appears to have controlled most aspects of the telephone expansion projects. *See* SAC at ¶¶ 404–05. In the complaint, NGC repeatedly alleges that Lucent bribed Al–Johani to ensure that he would make decisions related to the telephone expansion projects that were both beneficial to Lucent and harmful to NGC. Plaintiff also alleges that Al–Johani's approval and consent was crucial in allowing Lucent to cancel NGC's subcontracts.[13] *See, e.g.,* SAC at ¶¶ 400, 413, 415.

Standing alone, the fact that Al–Johani merely consented to the termination of the RET/WSF subcontract would probably not be sufficient to establish that the U.S. bribery scheme was a direct cause of plaintiff's contractual damages. However, plaintiff has also alleged that it was STC's restructuring and cancellation of certain TEP–6 projects and contracts that allowed Lucent to first reduce the scope of NGC's work under the RET/WSF subcontract and later terminate the contract entirely.

*See* Pl.'s Opp. at 23–24 (characterizing "central theme" of RICO claim as the allegation that "the defendants' bribery of Al–Johani led to STC canceling its contract with Lucent, thereby enabling Lucent to terminate Lucent Subcontract No. 1 with NGC"). *See also* Tr. of Dec. 2, 2005 Conf. at 21–22, 41.

Plaintiff has also demonstrated at least some temporal relationship between Lucent's donations to the Seattle hospital and various changes made to the RET/WSF subcontract that were detrimental to NGC. *See* Pl.'s Opp. at 24.[14] An internal Lucent e-mail attached to the complaint further suggests that Lucent billed the cost of the $2,035,000 million hospital donation to the TEP–6 project for accounting purposes. *See* SAC, Ex. 9.

■ On balance, we conclude that plaintiff's allegations establish subject matter jurisdiction under the conduct test. While we are acutely aware of the fact that many of the key events in this case took place in Saudi Arabia and primarily involved the Saudi plaintiff and various Saudi defendants, a significant number of predicate acts supporting plaintiff's RICO claim took place in the United States. In addition, an American company, Lucent, is alleged to have had a significant role in the U.S. bribery scheme. When we reach the ultimate inquiry of whether Congress would want a federal court to spend scarce resources on such a case, we conclude that the exercise of jurisdiction is appropriate where, as here, a foreign official was allegedly bribed on multiple occasions by an American company in the United States resulting in injury to a foreign plaintiff.

---

13. The termination of the RET/WSF subcontract allegedly saved Lucent between $10 and $35 million. SAC at ¶¶ 400, 412.

14. When a party challenges a court's subject matter jurisdiction in a motion to dismiss, examination of materials outside the complaint to resolve jurisdictional issues is permissible. *See, e.g., Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir. 1998); *In re South African Apartheid Litig.,* 346 F.Supp.2d 538, 546 (S.D.N.Y.2004).

While subject matter jurisdiction may be a close question, we conclude that some of the conduct at issue in this litigation has "significant and material contact[s]" to the United States. *North South Finance,* 100 F.3d at 1052. Consequently, we deny defendants' motion to dismiss for lack of subject matter jurisdiction.

## II. Are Plaintiff's Claims Time–Barred?

### A. Standard of Review for Rule 12(b)(6) Motion to Dismiss

When deciding a Rule 12(b)(6) motion to dismiss, a court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the non-movant's favor. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "Dismissal of a civil RICO complaint for failure to state a claim is only appropriate when it is clear that no relief could be granted under any set of facts that could be proved consistent with plaintiff's allegations." *Commercial Cleaning Services, LLC v. Colin Service Systems, Inc.,* 271 F.3d 374, 380 (2d Cir.2001) (internal citations and quotation marks omitted). However, it is also true that "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996).

In resolving a Rule 12(b)(6) motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000) (citations omitted).

### B. Accrual and Equitable Tolling of Civil RICO Claims

■ Civil RICO claims are subject to a four-year statute of limitations. *See, e.g., Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The statute of limitations begins to run "when the plaintiff discovers or should have discovered the RICO injury." *Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 35 (2d Cir.2002) (quoting *In re: Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 58 (2d Cir.1998)). Although RICO cases often involve "pattern[s] of predicate acts that [are] complex, concealed or fraudulent," the Supreme Court has clearly held that it is plaintiff's discovery of the injury, not discovery of the underlying pattern of predicate acts, which triggers the statute of limitations. *Rotella v. Wood,* 528 U.S. 549, 555–57, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). *See also Tran,* 281 F.3d at 36 (citing *Rotella* ).

■ The Second Circuit has also adopted a "separate accrual rule" pursuant to which a "new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *In re Merrill Lynch,* 154 F.3d at 59. Pursuant to this rule, a plaintiff who is continuously injured by an underlying RICO violation may only recover for injuries discovered or discoverable within four years of the time suit is brought. *See Bingham v. Zolt,* 66 F.3d 553, 560 (2d Cir.1995).

In exceptional circumstances, equitable tolling doctrines such as the doctrine of fraudulent concealment may provide some relief from *Rotella'*s stringent injury discovery rule. *See Rotella,* 528 U.S. at 561, 120 S.Ct. 1075 (stating that equitable tolling is "the exception, not the rule"); *131 Main Street Associates v. Manko,* 179

F.Supp.2d 339, 346 (S.D.N.Y.2002). However, "[t]he burden of demonstrating the appropriateness of equitable tolling ... lies with the plaintiff." *Boos v. Runyon,* 201 F.3d 178, 185 (2d Cir.2000). To properly invoke the doctrine of fraudulent concealment, plaintiff must establish three elements including: (1) wrongful concealment by defendants (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim. *In re: Merrill Lynch,* 154 F.3d at 60; *Butala v. Agashiwala,* 916 F.Supp. 314, 319 (S.D.N.Y.1996).[15] Plaintiff must plead each of these elements with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. *See Butala,* 916 F.Supp. at 319 (citing cases).

### C. Factual Analysis

Plaintiff filed its initial complaint in this case on August 8, 2003. Therefore, unless the doctrine of fraudulent concealment applies, RICO claims related to injuries discovered, or discoverable, by plaintiff before August 8, 1999 are barred by the statute of limitations.

NGC has alleged three specific injuries. First, NGC claims that it was injured when it was forced to make a series of kickback payments to ACEC–Saudi and Bugshan during the TEP–6 project. SAC at ¶¶ 195–208. Second, NGC claims it was harmed when AT & T International cancelled ASB Subcontract No. 5 in retaliation for NGC's refusal to make certain kickback payments "up front." SAC at ¶ 126. Third, NGC claims that it was harmed

when Lucent cancelled the RET/WSF subcontract. *Id.* We analyze the statute of limitations for claims related to each of these injuries seriatim.

### 1. Kickback Payments in Saudi Arabia

During oral argument, plaintiff conceded that its claims related to the alleged kickback payments are now barred by the statute of limitations. *See* Tr. of Dec. 2, 2005 Conf. at 23–24. A brief discussion of the facts supporting that conclusion seems appropriate nonetheless. According to plaintiff, during a March 1995 meeting, Bugshan demanded that NGC make six percent kickback payments on all TEP–6 invoices. SAC at ¶¶ 158, 164–76. Shortly after this meeting, NGC signed two agreements that allegedly outlined the future schedule of kickback payments to be made on all TEP–6 work. SAC at ¶¶ 164–77. NGC made its first kickback payment on or about August 5, 1995, and continued to make regular six percent payments on TEP–6 invoices to Bugshan through ACEC–Saudi until February 5, 2000. SAC at ¶¶ 201, 206.

Although NGC failed to brief the issue, we recognize that the separate accrual rule of this Circuit is potentially implicated in any RICO case where multiple injuries occur over an extended period of time. Under this rule, "a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered a new injury caused by the predicate RICO violations." *Bingham v. Zolt,* 66 F.3d 553, 560 (2d

---

**15.** There has been some variation in the way that the three elements have been articulated in this Circuit. *See, e.g., State of New York v. Hendrickson Brothers, Inc.,* 840 F.2d 1065, 1083 (2d Cir.1988). The *Hendrickson* panel stated that a plaintiff invoking the doctrine of fraudulent concealment must show: "(1) that

the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *Id.*

Cir.1995). *See also Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988).

■ Unlike *Bingham* and *Bankers Trust*, this is a case where plaintiff discovered, or could have discovered, the full extent of related, future injuries at the outset of a single, unlawful scheme. The *In re: Merrill Lynch* decision confirms that, in at least some cases, injuries are not "new and independent" when they are attributable to a common scheme. *See* 154 F.3d at 59–60 (finding that plaintiff's injury occurred when investment made and subsequent collections of annual fees were not separate acts or injuries). *See also Pharr v. Evergreen Gardens, Inc.*, No. 03 Civ. 5520(HB), 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004)(rejecting plaintiffs' argument that monthly invoices containing false charges resulted in "new and independent injuries" when monthly rent was paid).

In this case, plaintiff's own allegations confirm that the kickback payments were clearly outlined to NGC several months before the first kickback payment was made. *See* SAC at ¶¶ 158, 164–77. The injuries caused by the Saudi kickback scheme were not speculative because NGC understood in 1995 that it would be making six percent kickback payments on all revenue earned from ASB subcontracts. Under these circumstances, we conclude that the statute of limitations began to run on all NGC's extortion claims when the first kickback payment was made in August 1995. Since plaintiff waited until 2003 to file this lawsuit, the RICO claims related to the alleged kickback payments are now time-barred.[16]

Moreover, because defendant Mohsen Sheikh El–Ard is only alleged to have engaged in predicate acts related to the Saudi kickback scheme,[17] the claims against him must be dismissed from this action on statute of limitations grounds. Appreciating this reasoning, plaintiff withdrew its claim against defendant El–Ard during oral argument. *See* Tr. of Dec. 2, 2005 Conf. at 51–52.

### 2. Cancellation of ASB Subcontract No. 5

■ Both parties agree that NGC discovered its injury when ASB Subcontract No. 5 was terminated on January 23, 1996.[18] NGC also admits that it was aware at the time that the termination was intended to punish NGC for its refusal to make kickback payments on ASB Subcontract No. 2 "up front." *See* SAC at ¶¶ 185–90. Plaintiff nevertheless argues that it may invoke the doctrine of fraudulent concealment to toll the statute of limitations because some of the defendants concealed the U.S. acts of bribery supporting the RICO cause of action.[19] *See gener-*

---

16. With good reason, plaintiff never seriously argued that fraudulent concealment should toll the statute of limitations with respect to the extortion claims. *See* Pl.'s Opp. at 9–22. Plaintiff's own allegations clearly show that the doctrine should not toll the limitations period for plaintiff's extortion claims. Defendants did nothing to conceal the kickback scheme from plaintiff, who was on notice of a potential claim in 1995. *See 131 Main Street Associates*, 179 F.Supp.2d at 349.

17. *See* SAC at ¶¶ 164–77.

18. Plaintiff has produced a termination letter dated January 23, 1996 in which AT & T International explained that MoPTT "ha[d] refused to give approval" for NGC to undertake the work. *See* SAC, Ex. 1. Defendants also agree that this was the date of injury. *See* Defs.' Omnibus Brief at 7.

Plaintiff appears to be claiming $47 million in damages related to the cancellation of ASB Subcontract No. 5. *See* SAC at ¶ 181.

19. Plaintiff has most clearly advanced the fraudulent concealment argument to support its contention that the claims related to the

*ally* Pl.'s Opp. at 15–22; SAC at ¶¶ 456–462. We disagree.

To establish the first element, wrongful concealment by defendants, NGC argues that the acts of bribery were "self-concealing." *See* Pl.'s Opp. at 16–17. Plaintiff emphasizes that: (1) Lucent's donations to the Seattle hospital were anonymous; (2) Al–Johani registered at U.S. hotels under an assumed name; and (3) U.S. bank accounts and the private jet used to bribe Al–Johani were registered under names designed to obscure their true owners. *See* Pl.'s Opp. at 17.[20] NGC also alleges that Lucent later engaged in "active concealment" by making "affirmative and flagrant misstatements in response to several specific discovery requests" during the course of the New Jersey litigation.[21] According to NGC, this conduct delayed its discovery of the acts of bribery in the United States. *See* Pl.'s Opp. at 18.

We will assume for purposes of resolving this motion that plaintiff's allegations are sufficient to support a finding of wrongful concealment by at least some of the defendants. However, plaintiff must also show that the concealment "prevented [NGC's] discovery of the nature of the claim within the limitations period," and that plaintiff "exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Tran*, 281 F.3d at 36–37 (quoting *Corcoran v. New York Power Auth.*, 202 F.3d 530, 543 (2d Cir.1999)).

While we recognize that discovery of the alleged U.S. acts of bribery conveniently provided NGC with a jurisdictional hook to pursue a RICO cause of action in American courts, no evidence whatsoever connects the cancellation of ASB Subcontract No. 5 in Saudi Arabia with the alleged U.S. acts of bribery and money laundering.[22]

---

RET/WSF subcontract are not time-barred. However, plaintiff also argues (in a single paragraph) that the doctrine should apply to the ASB Subcontract No. 5 claims. *See* Pl.'s Opp. at 22.

**20.** Plaintiff supports the "self-concealing" argument by citing the Second Circuit's decision in *Hendrickson*, 840 F.2d at 1083. In that decision, the Circuit suggested that proof of the bid-rigging conspiracy itself was sufficient to establish wrongful concealment. *Id.* at 1083–85. ("[P]laintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing.") We note that *Hendrickson* was not a civil RICO case and pre-dated *Rotella*. However, recent RICO decisions by district courts continue to suggest that the first element may be satisfied where the "nature of the wrong itself" was self-concealing. *Butala*, 916 F.Supp. at 319. *See also 131 Main Street Associates*, 179 F.Supp.2d at 347. *But see Tran*, 281 F.3d at 37 (concluding that plaintiff failed to establish that defendants fraudulently concealed bribes).

**21.** Pl.'s Opp. at 18. Plaintiff emphasizes Lucent's refusal to answer and/or erroneous responses to interrogatories and document requests prepared by NGC in 2000 and 2001 that specifically requested information about any payments made to Al–Johani, STC, MoPTT or Fred Hutchinson Cancer Research Center. *See, e.g.,* SAC at ¶¶ 464–67, 476–80, 504–05. For example, in a response dated September 10, 2001 Lucent denied making any payments to Fred Hutchinson Cancer Research Center, but later acknowledged donations totaling $2.35 million in 2002. *See* SAC at ¶¶ 478–79, 485.

**22.** *See infra* Part III(B). NGC's complaint is devoid of facts connecting the cancellation of ASB Subcontract No. 5 with the alleged U.S. acts of bribery and money laundering. Although plaintiff broadly claims that Al–Johani was bribed as early as 1995, all of the specifically alleged U.S. acts of bribery occurred *after* ASB Subcontract No. 5 was cancelled. *See, e.g.,* SAC at ¶¶ 216, 223, 247, 267, 270, 274, 294, 307, 345, 350, 370, 382.

Significantly, NGC has conceded that it does not now have any greater evidence of a connection between the bribery of Al–Johani

NGC admits that in 1996 it knew that the termination of ASB Subcontract No. 5 was intended to punish NGC for its refusal to comply with certain extortionate demands. *See* SAC at ¶¶ 185–90. This information should have been sufficient to put NGC on notice to broadly investigate potential claims in January 1996, as NGC must have known that it was not facing an ordinary breach of contract situation.[23] Certainly, the information NGC possessed in 1996 should have been sufficient to challenge the alleged misconduct in Saudi tribunals. Under these circumstances, concealment of the U.S. bribery and money laundering could not have obscured from NGC the true "nature" of its cause of action with respect to ASB Subcontract No. 5.

We also conclude that NGC has failed to sufficiently allege reasonable diligence. *Klehr*, 521 U.S. at 194–95, 117 S.Ct. 1984. While the complaint demonstrates that NGC aggressively sought out evidence to support a possible RICO cause of action after commencing the New Jersey contract litigation, NGC has not pled any investigative efforts during the four-year period between when ASB Subcontract No. 5 was cancelled and when discovery commenced in the New Jersey litigation. *See* SAC at ¶¶ 456–602. The third element requires due diligence by plaintiff *throughout* the period to be equitably tolled, and NGC has not alleged with any specificity what efforts it made to investigate a RICO cause of action in the four years following January 23, 1996. *See Tran*, 281 F.3d at 37.

Plaintiff's allegations therefore also fail to establish the third element.

For these reasons, we reject plaintiff's argument that the statute of limitations which began to run on January 23, 1996 should be equitably tolled and conclude that the RICO claims related to ASB Subcontract No. 5 are time-barred.

### 3. Cancellation of RET/WSF Subcontract

The RET/WSF subcontract included work on two distinct projects, one involving the installation of roadside emergency telephones ("RET project") and the other involving the installation of wayside facilities ("WSF project"). The parties vigorously dispute when this subcontract was formally terminated, but seem to agree that the WSF project was cancelled before the RET project. *See* Pl.'s Opp. at 10–14; Defs.' Omnibus Brief at 10–11.

As both parties recognize, factual disagreement about the termination date is important because RICO claims based on injuries that NGC discovered, or should have discovered, prior to August 8, 1999 are time-barred. In the complaint, NGC alleges that AT & T International formally cancelled the RET/WSF subcontract in its entirety on January 29, 2000.[24] SAC at ¶¶ 400, 415. Defendants emphasize that this allegation conflicts with statements NGC made in a prior complaint asserting related contract claims filed in the District

---

and the termination of ASB Subcontract No. 5 than it did when the subcontract was terminated in 1996. *See* Tr. of Dec. 2, 2005 Conf. at 25–28.

**23.** *See Rotella*, 528 U.S. at 555–57, 120 S.Ct. 1075 (discussing plaintiff's duty to investigate cause of action once injury discovered).

**24.** Plaintiff has explained in its Opposition that the termination date of January 29, 2000 it currently alleges is based on an interrogatory response it received from Lucent in the N.J. litigation which allegedly stated that: "[O]n January 29, 2000, the [Saudi Telecom Company] cancelled all work on the RET project." *See* Pl.'s Opp. at 12 (citing Smith Decl. ¶ 10, Ex. I). As defendants point out, this termination date is somewhat puzzling since January 29, 2000 is twenty-two days after the plaintiff filed its breach of contract complaint in New Jersey.

Court of New Jersey ("NJ complaint"). *See* Defs.' Omnibus Brief at 10–11; Castello Decl. at ¶ 6; Ex. C at ¶ 17. In the NJ complaint, NGC alleged that the WSF portion of the subcontract was cancelled on June 6, 1999 and that the RET portion of the subcontract was cancelled on July 4, 1999. *See* Defs.' Omnibus Brief at 10 and Ex. C at ¶ 17. If those dates were factually correct, both claims would be time-barred, and defendants therefore argue that NGC ought to be bound by its prior "admissions".[25]

In response, plaintiff concedes that the WSF portion of the subcontract was cancelled by STC on June 6, 1999, but argues that its prior statements about the cancellation date of the RET project were erroneous. *See* Pl.'s Opp. at 10–11. ("Although the WSF project was cancelled on June 6, 1999, NGC never received any notice that the *entire* Lucent Subcontract No. 1 was terminated.")(emphasis added). Plaintiff has also identified specific information gleaned from discovery in the New Jersey litigation that tends to confirm that the termination date of the RET/WSF subcontract was not clear. *See* Pl.'s Opp. at 11–13 (summarizing interactions between the parties occurring after Aug. 9, 1999 tending to suggest that the subcontract was still in effect).

Under these circumstances, we agree with plaintiff that there is factual uncertainty as to when the RET/WSF subcontract was terminated in its entirety. Since the record is not yet clear on the date when the injury occurred, we conclude that

dismissal of plaintiff's RICO claims related to RET/WSF subcontract on statute of limitations grounds is inappropriate at this time.

However, the claims against Mashar Raslan and IT Properties, Inc. must be dismissed on statute of limitations grounds. Although the parties dispute exactly when the RET/WSF subcontract was terminated, the latest date of contractual termination and injury alleged is NGC's current allegation of January 29, 2000. Plaintiff only sought permission from this Court to add Raslan and IT Properties as defendants on July 9, 2004, more than four years after January 29, 2000.[26] *See Rothman*, 220 F.3d at 96 (stating that when new defendant is added, the relevant date for statute of limitations purposes is the filing date of the motion to amend) (citations omitted). We therefore grant the motion to dismiss the claims against defendants Raslan and IT Properties as they are time-barred.[27]

Because a portion of the claims against defendants other than El–Ard, Raslan and IT Properties are not clearly barred by the statute of limitations, we proceed to consider additional Rule 12(b)(6) arguments.

### III. Has Plaintiff Adequately Pled the Elements of a RICO Claim?

#### A. Overview of the Elements of a § 1962(c) RICO Claim

To state a valid claim under Section 1962(c), a plaintiff must allege the follow-

---

25. Defendants correctly suggests that this Court may consider the NJ complaint in resolving the motions to dismiss because the complaint is a matter of public record, and because plaintiff explicitly refers to information learned during discovery in that case in its second amended complaint. *See* Defs.' Omnibus Brief at 11. *See also* SAC ¶¶ 136, 459, 464–521.

26. Raslan and IT Properties were not named as defendants in the original complaint filed in this matter on August 8, 2003.

27. *See* Supplemental Mem. of Law of Defs. Mashar Raslan and IT Properties, Inc. in Support of Mot. to Dismiss.

ing: (1) defendants through the commission of two or more predicate acts; (2) constituting a "pattern" (3) of "racketeering activity" (4) directly or indirectly invested in, or maintained an interest in, or participated in (5) an "enterprise"; (6) the activities of which affect interstate or foreign commerce. *See Madanes*, 981 F.Supp. at 252 (citing *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir.1983)).[28]

■ In order to have standing, plaintiff must also show that injuries to its business or property were "proximately caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts." *Lerner v. Fleet Bank N.A.*, 318 F.3d 113, 122–23 (2d Cir.2003).

Defendants argue that plaintiff's pleading of these elements has been deficient in a number of respects. Since we conclude that the plaintiff has not adequately alleged a RICO enterprise, we need not address other arguments raised by the defendants in support of their motions to dismiss.

## B. The "Enterprise"

■ RICO broadly defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court had held that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" which must be proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). *See also First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir.2004)(quoting *Turkette* ). Furthermore, the alleged enterprise must be an "entity separate and apart from the pattern of racketeering activity in which it engages." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524.

The Second Circuit has construed the enterprise element liberally and does not require RICO plaintiffs to plead continuity beyond the performance of racketeering acts [29] or a centralized structure [30] to establish the enterprise element. In addition, the same evidence may be used to establish a "pattern" of predicate acts and an "enterprise" in this Circuit. *United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir. 1983). Although the standard for pleading an enterprise is not particularly burdensome, at least *some* proof of ongoing association and a shared purpose is needed to

---

28. The elements of a Section 1962(c) claim must be established as to each individual defendant. *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.2001)("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d).")(citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir.1987)).

29. *See United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir.1989) (suggesting that the "concepts of relatedness and continuity are attributes of [a pattern of] activity, not of a RICO enterprise").

30. Decisions such as *Mazzei*, 700 F.2d at 89–90 and *United States v. Errico*, 635 F.2d 152, 156 (2d Cir.1980) suggest that centralized hierarchy is not required and that the enterprise element may be established merely by proof of defendants cooperation in a common pattern of racketeering acts. Other Circuits have adopted more demanding pleading standards requiring plaintiffs to demonstrate that the association-in-fact enterprise has a structure independent of the underlying pattern of predicate acts. *See, e.g., Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453 (5th Cir. 1991); *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.1982).

adequately plead and prove a RICO enterprise. *See First Capital Asset Management*, 385 F.3d at 173–74; *United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir. 1991).

 In this case, plaintiff claims that a single "association-in-fact" enterprise involving all seventeen defendants participated in a wide-ranging pattern of predicate acts including extortion, bribery and money laundering. Plaintiff essentially claims that Lucent, Lucent officers and employees, and various defendants associated with Bugshan were united in a "joint venture" having the common purpose of bribing Al–Johani. *See* Tr. of Dec. 2, 2005 Conf. at 33–34.[31] However, despite the length of the most recent complaint, plaintiff fails to set forth facts to support the conclusion that all seventeen defendants were actually working with one another or associated together in a single ongoing organization or continuing unit where members worked together to accomplish a common purpose. *See First Capital Asset Management*, 385 F.3d at 174 ("For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular . . . course of conduct and work together to achieve such purposes.")(quoting *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F.Supp. 89, 98 (S.D.N.Y.1993)). *See also . Feinberg v. Katz*, No. 99 Civ. 45(CSH), 2002 WL 1751135, at *16 (S.D.N.Y. July 26, 2002)(dismissing complaint containing "generalized allegations" unsupported by facts showing how the defendants acted together as a continuing unit).

In this case, the specific allegations set forth in the complaint paint a picture of at least two distinct schemes or conspiracies. One group of defendants including Bugshan, ACEC–Saudi, ASB, El–Ard and possibly Al–Johani are alleged to have participated in a Saudi-based extortion scheme benefiting Bugshan. A larger group of defendants including Lucent and various individual Lucent employees, ACEC–Suisse, ACEC–Saudi, Bugshan, Amacker, IT Properties and Raslan are alleged to have been involved in a U.S. bribery and money laundering scheme primarily intended to benefit Al–Johani and Lucent.[32]

31. Plaintiff's descriptions of the "common purpose" driving the enterprise have varied. For example, plaintiff states at the outset of the complaint that the "commonality of purpose in the Scheme was to ensure that ASB and Lucent shared monies derived from the extortion of NGC and others and money from Lucent's and ASB's billion dollar contracts with STC. The purpose of the Scheme was advanced by members of the Enterprise bribing Al–Johani to make use of his offices to ensure profits." SAC at ¶ 119. Elsewhere, the common purpose is alleged to be "the extortion of NGC and others, money laundering and the bribery of Al–Johani to induce Al–Johani to make favorable decisions for AT & T/Lucent and ASB under TEP–6, to harm NGC under TEP–6 and to award AT & T/Lucent and ASB business under TEP–6,7,8." SAC at ¶ 608.

During oral argument, NGC either simplified or retreated from its original allegations, stating that the common purpose uniting all defendants was simply the bribery of Al–Johani. *See* Tr. of Dec. 2, 2005 Conf. at 21–23, 33–34, 38. This change in strategy is understandable given the absence of facts to support a connection between the alleged Saudi extortion scheme and U.S. bribery and money laundering schemes.

32. We agree with defendants that plaintiff consistently "lumps" together defendants throughout the complaint in a manner that makes it difficult to identify each participant's role in the alleged course of illegal conduct. *See* Defs.' Omnibus Brief at 20–21, 30. *See also First Capital Asset Management*, 385 F.3d at 175.

That said, the complaint does contain some specific allegations concerning the activities of, and relationships among, certain defendants. Our list of defendants involved in each scheme is based on a review of the *specific*

While the complaint suggests that some of the defendants were involved in both schemes, there are significant differences in the personnel and objectives of these two conspiracies. The factual allegations set forth in the complaint do not suggest that the Saudi extortion and U.S. bribery/money laundering schemes were guided by a common purpose. Thus, an essential element needed to plead an enterprise is lacking.

Moreover, although plaintiff repeats the legal conclusion that a single enterprise involving all of the defendants existed, NGC fails to provide "any solid information regarding the hierarchy, organization, and activities of [the] alleged association-in-fact enterprise from which we could fairly conclude that its members functioned as a unit." *First Capital Asset Management*, 385 F.3d at 174–75 (quoting *United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir.1991) and *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F.Supp.2d 514, 539 (S.D.N.Y.2001))(internal quotation marks omitted).

Under these circumstances, we conclude that the remaining 1962(c) claims should be dismissed pursuant to Rule 12(b)(6) because of plaintiff's failure to adequately allege an enterprise.

## C. § 1962(d) Claim

 Section 1962(d) prohibits individuals from conspiring to violate the substantive provisions of RICO set forth at 18 U.S.C. §§ 1962(a)-(c). Defendants argue that plaintiff's 1962(d) claims should be dismissed for two reasons. Defs.' Opp. at 32. First, without a substantive RICO violation there can be no RICO conspiracy. *See id.* Second, plaintiff's allegations concerning an agreement among the defendants to commit predicate acts are entirely conclusory. *See id.* We agree.

Case law in this Circuit confirms that a 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient. *See, e.g., First Capital Asset Management*, 385 F.3d at 182; *Cofacredit, S.A. v. Windsor Plumbing Co. Inc.*, 187 F.3d 229, 244–45 (2d Cir.1999); *Oak Beverages, Inc. v. Tomra of Massachusetts, L.L.C.*, 96 F.Supp.2d 336, 350 (S.D.N.Y. 2000).

In addition, NGC has not "alleg[ed] facts implying any agreement involving each of the defendants to commit at least two predicate acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990). "Conclusory allegations of a conspiracy are insufficient" to plead a Section 1962(d) claim. *Black Radio Network v. Nynex Corp.*, 44 F.Supp.2d 565, 581 (S.D.N.Y.1999). While NGC repeatedly states that defendants "conspired" or "agreed" with one another,[33] the complaint fails to set forth sufficient facts to suggest how each of the defendants, through words or actions, reached an agreement. For these reasons, we dismiss NGC's RICO conspiracy claims against defendants.

allegations contained in the complaint. What is missing from the complaint is any evidence of an organization uniting *all* of the named defendants on a continuing basis. *See* Pl.'s Opp. at 47–48 (listing the groups of defendants who participated in the extortion, money laundering and bribery schemes respectively).

**33.** For example, NGC states that "one or more members of the Enterprise agreed with and conspired with the other members of the Enterprise to arrange for and to pay money to Al–Johani and the medical, transportation, lodging and related expenses of Al–Johani and his family in the United States[.]" SAC at ¶ 218. Another allegation suggests that "defendants herein aided and abetted one another and conspired together to commit the predicate racketeering activities against NGC and others." SAC at ¶ 636.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted. Plaintiff's claims related to the kickback payments and ASB Subcontract No. 5 are dismissed on statute of limitations grounds. We also dismiss plaintiff's claims against defendants El–Ard, Raslan and IT Properties on these grounds.

We dismiss the claims against the remaining defendants on the ground that plaintiff has failed to adequately allege the enterprise element required to plead a cause of action under 18 U.S.C. § 1962(c). We also dismiss the Section 1962(d) conspiracy claims because of plaintiff's failure to adequately allege an enterprise or agreement involving all of the defendants.

NGC has already had a significant opportunity to engage in discovery as part of the N.J. litigation. This Court has also given NGC the opportunity to file two amended complaints, the most recent of which extended to 117 pages. Under these circumstances, we dismiss the complaint without granting plaintiff leave to replead.

All other motions filed by defendants in this case are dismissed as moot. The Clerk of Court is respectfully requested to close this case.

**IT IS SO ORDERED.**